IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LORRAINE C. WASHINGTON**<br>**6713 SUMMERHILL ROAD**<br>**TEMPLE HILLS, MD 20748**<br><br>Plaintiff,<br><br>v.<br><br>**THE URBAN INSTITUTE**<br>**500 L'ENFANT PLAZA, SW**<br>**WASHINGTON, DC 20024**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. _____**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR RELIEF FROM**
**DISABILITY AND RACE DISCRIMINATION IN EMPLOYMENT**

1. Despite her 29 years of dedicated service, The Urban Institute terminated Lorraine Washington's employment on account of Ms. Washington's need for an accommodation for her disabilities. Washington had served as a Senior Contracts Administrator for seven years, performing her job well with reasonable accommodations for her disabilities, a chronic and grueling auto-immune disease known as Systemic Lupus Erythematosus, and coronary artery disease. She had been competently performing her job working part-time, with three days at the office and two days of teleworking. The Urban Institute ripped this accommodation away from her, insisting she either had to return to work full-time in the office or she would be terminated, even though it has conceded that continuing to accommodate Washington would not impose an undue burden on the organization. Defendant's actions violated the Americans with Disabilities Act, 42 U.S.C.

§§ 12101 *et seq.* (ADA), as amended by the ADA Amendments Act of 2008, and the District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2-1402.11 *et seq.*

2. The Urban Institute also treated Ms. Washington's request for an accommodation differently on account of her race, permitting a similarly situated white employee who needed a part-time schedule the accommodation she requested. These race-based actions violated the DCHRA, as well as 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, and Plaintiff now seeks relief for all of the discrimination and injuries she has suffered.

## JURISDICTION, VENUE AND PARTIES

3. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 42 U.S.C. § 12117, D.C. Code Ann. § 2-1403.16, 42 U.S.C. § 1981 and 42 U.S.C. §2000e-5(f)(3). Venue is proper in this District under 28 U.S.C. § 1391(b), because the events that gave rise to Plaintiff's claims occurred in this district.

4. Plaintiff, Lorraine C. Washington, is a resident of the state of Maryland who was employed by defendant in Washington DC from July 9, 1989, to July 27, 2018, when Defendant terminated her.

5. Defendant, The Urban Institute, is a non-profit research organization and think-tank involved in economic and social/public policy. For all relevant time periods, Defendant employed Plaintiff. Defendant made the decisions to deny her reasonable accommodation and instead terminate her employment, the decisions challenged in this Complaint. The Urban Institute is an employer as defined in the relevant statutes, and employs more than 15 employees. Defendant The Urban Institute can sue or be sued in

this judicial district.  This Court has personal jurisdiction over Defendant.  This Court has subject matter jurisdiction over the facts alleged herein.

## FACTUAL BACKGROUND

6.      For nearly 30 years, Plaintiff Lorraine Washington diligently and faithfully worked for The Urban Institute.  With her strong work record, Ms. Washington received promotions and annual performance salary increases through the years she worked at The Urban Institute, ultimately leading to her promotion to a Senior Contracts Administrator in January 2011.

7.      Ms. Washington was working as a Senior Contracts Administrator when The Urban Institute terminated her on July 27, 2018.

8.      Ms. Washington suffers from the following disabilities, which were diagnosed during her long tenure working for The Urban Institute: Systemic Lupus Erythematosus ("SLE"), a chronic and incurable condition which was diagnosed in November 2004; coronary artery disease, which was diagnosed in 2011; and hypothyroidism disease, which was diagnosed in 2000.[1]

---

[1] Systemic Lupus Erythematosus ("SLE") is defined as "a chronic, inflammatory, often febrile multisystemic disorder of connective tissue that proceeds through remissions and relapses; it…is characterized principally by involvement of the skin…joints, kidneys, and serosal membranes….[I]t may be a failure of regulatory mechanisms of the autoimmune system….The condition is marked by a wide variety of abnormalities, including arthritis, arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, an elevated erythrocyte sedimentation rate, and the presence in the blood of distinctive cells called LE cells." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1080 (32d ed. 2012) [hereinafter DORLAND'S].

Coronary artery disease is defined as "atherosclerosis of the coronary arteries, which may cause angina pectoris, myocardial infarction, and sudden death." DORLAND'S 531.  Atherosclerosis is "a common form of arteriosclerosis with formation of deposits of yellowish plaques…containing cholesterol, lipoid material, and lipophages in the intima and inner media of large and medium-sized arteries." DORLAND'S 172.

Hypothyroidism is defined as "deficiency of thyroid activity, characterized by decrease in basal metabolic rate, fatigue, and lethargy; if untreated, it progresses to myxedema. In adults, it is more common in women than men[.]" DORLAND'S 907.

9. Ms. Washington suffers with joint pains, inflammation (which causes joint swelling), arthritis, muscle pain, a weakened immune system, headaches and extreme fatigue as some of the symptoms of her SLE.  Her disability has effects on other bodily systems.  This can include worsening of her heart disease as it is exacerbated by her SLE, causing chest discomfort, shortness of breath and other symptoms.  During increased activity of her SLE, she can experience cognitive changes, severe fatigue, and impaired memory with prolonged concentration.  Ms. Washington takes medications and utilizes treatments to control her SLE, which come with their own side effects.

10. These conditions substantially impair many of Ms. Washington's major life activities, including her ability to walk, stand for prolonged periods of time, engage in other physical activities, drive, breathe, sleep, concentrate, work and interact with others.

11. In April 2016, Ms. Washington's disability caused her to be out of work for an extended period of time.  She was released by her treating physician to return to work on June 20, 2016, with accommodations.  Her treating physician suggested the accommodation of a part-time schedule, working in the office for two days each week and teleworking three days a week, working no more than four hours a day or no more than 20 hours per week.

12. Both Ms. Washington's rheumatologist and her cardiologist recommended and supported her requested work schedule.

13. The Urban Institute altered Ms. Washington and her physician's requested accommodation by setting her work schedule to working in the office three days a week and teleworking two days a week.

14. Despite the modification and the fact that it was not the work schedule approved by her physician, Ms. Washington agreed to return to work immediately with The Urban Institute's requested change in accommodation.

15. The Urban Institute did not allow Ms. Washington to return to work until August 16, 2016, over two months after Washington submitted her "Fitness for Duty Certification" completed by her rheumatologist releasing her to return to work.

16. When The Urban Institute allowed Ms. Washington to return to work on the schedule it had proposed – three days a week in the office and two days of telework – it also set other arbitrary restrictions on the terms of her employment, requiring her to work 11:00 am – 3:00 pm.  The Urban Institute also insisted that Washington could not be out of the office on any Friday, except in case of an emergency.  Washington complied with these restrictions.

17. On or about October 1, 2016, Ms. Washington developed shingles, a painful syndrome that she is more susceptible to because of her autoimmune disease.[2] Shingles is also more likely to develop under increased physical or emotional stress.  Her severe case of shingles included lesions and swelling from the top of her head, across and down her face on the left side, around her eyelid, and ended under her nose.  Washington had intense pain and was restricted from driving by her physician.

---

[2] Shingles is known medically as "herpes zoster." DORLAND'S 1703.  It is "an acute, infectious, usually self-limited disease believed to represent activation of latent human herpesvirus 3 in those who have become partially immune after an attack of chickenpox.  It involves the sensory ganglia and their areas of innervation, and is characterized by severe neuralgic pain along the distribution of the affected nerve with crops of clustered vesicles over the area of the corresponding dermatome; it is usually unilateral and confined to one dermatome or adjacent ones.  Postherpetic neuralgia may be a complication.  In immunocompromised patients it may disseminate and be fatal." DORLAND'S 852.

18.     Despite developing shingles and the pain it caused, she continued to work remotely via telework in a timely and accurate fashion for The Urban Institute for four hours a day, five days a week, an accommodation granted by The Urban Institute.

19.     In mid-December 2016, her physicians released Ms. Washington to return to work, clearing her for the previous part-time schedule working three days a week in the office and two days of telework.

20.     Even after Ms. Washington was cleared to return to work after developing shingles, she continued to experience and suffers from post-herpetic neuralgia[3] in addition to her SLE and coronary artery disease.

21.     Ms. Washington was required to provide quarterly written letters from her physician detailing treatment, status, or evaluation to her supervisor and Human Resources ("HR") Interim Director in order to keep her job. She complied with these requirements.

22.     From mid-December 2016 until her termination on July 27, 2018, Ms. Washington continuously worked in her Senior Contracts Administrator role with the accommodation of working a part-time schedule with three days a week in the office and two days of telework.

23.     With these accommodations for her disability, Ms. Washington was able to successfully perform all of the essential functions of her job, and she received praise from colleagues and positive performance appraisals from her supervisors for the work that she performed.

24.     In her role as Senior Contracts Administrator, working in The Urban Institute's Office of Grants, Contracts, Purchasing and Pricing, Ms. Washington generally

---

[3] Postherpetic neuralgia is "persistent burning pain and hyperesthesia along the distribution of a cutaneous nerve following an attack of herpes zoster[.]" DORLAND'S 1262.

managed a number of portfolios, with signature authority up to $300,000. These included research portfolios for Metropolitan Housing and Communities Policy Center (MET), Center on Nonprofit and Philanthropy (CNP), Statistical Methods Group (SMG), Income and Benefits Center (IBP), Labor, Human Services and Population Center (LHP), and Urban-Brookings Tax Policy Center (TPC).

25. Ms. Washington worked under various directors during her time at The Urban Institute. As relevant to this lawsuit, Marcus Stevenson was the director and Washington's supervisor until approximately December 2016, when he stepped down and the Interim Director, Don Spencer, took over. Mr. Spencer served as Washington's supervisor until approximately June 8, 2017. For an interim period of time, Nani Coloretti oversaw the department starting around June 2017. In approximately February 2018, Rachel Conway became a Director and Washington's new supervisor.

26. When Ms. Washington returned from her leave in 2016, her workload was altered by removing one of the portfolios she worked on, Income and Benefits Center (IBP). She continued at that point to manage the heavy workload of Metropolitan Housing and Communities Policy Center (MET), one of The Urban Institute's biggest centers, and also managed the Statistical Methods Group (SMG).

27. Around August 2017, during a period when the department lacked a Director, The Urban Institute underwent a reorganization, rotating individuals in Ms. Washington's office to manage different administration and management centers, changing each person's staff portfolios and implementing a new accounting system. At that time, Washington was assigned to the Labor, Human Services and Population (LHP) center and

retained the Statistical Methods Group (SMG) portfolio. In that role, she continued to successfully perform all of the essential functions of her job.

28. In or around March 2018, The Urban Institute advertised for one Senior Contracts Administrator position and one Contracts Administrator position.

29. In April 2018, Ms. Washington had a meeting with her new director, Rachel Conway. During the meeting, Conway told Washington that she needed the incumbent in Washington's position to work full-time. Washington responded that her physicians had not cleared her to work full-time. Conway then said that she would raise the issue with HR and that they would need to have a meeting with HR Director, Monica Woods; Woods remained involved as the HR point-person for The Urban Institute.

30. In a second meeting later in April 2018, Woods informed Ms. Washington that Conway had decided that the position must be filled with an incumbent working in a full-time capacity.

31. In May 2018, The Urban Institute hired two full-time Senior Contracts Administrators. In June 2018, The Urban Institute promoted an existing Senior Contracts Administrator to a newly created Senior Contracts Manager position and promoted a Junior Contracts Administrator to a Senior Contracts Administrator.

32. The Urban Institute gave one of Ms. Washington's centers to one of the newly hired employees, who was a white individual who did not have a disability.

33. Ms. Washington retained counsel who contacted The Urban Institute and implored the company to reconsider the decision to revoke her accommodations. Her attorney requested to be informed of the undue burden that had arisen, and to explore the interactive process to see if there was an accommodation that could resolve the issue. The

letters also implored The Urban Institute not to fire Washington, given her exemplary employment for almost 30 years.  During that time, Washington's counsel was corresponding with Monica Woods.

34. In a letter on May 25, 2018, Ms. Woods stated that "[t]he recent changes in the Office's needs, as well as those of Urban, generally have not made the accommodation one that is causing an undue hardship."

35. Despite this concession, The Urban Institute went forward with its plans to terminate Ms. Washington because she could not return to full-time work in the office due to her disability.

36. On June 28, 2018, Ms. Washington was notified that her employment was being terminated effective July 27, 2018.

37. Ms. Washington's department had been handling a stable amount of work performing contract administration, which did not change at the point at which The Urban Institute told Washington it would either terminate her employment or she would have to return to the position full-time.

38. In fact, if there was any change at all, it was a decrease in work, as the workload declined as federal contracts and grants were not being funded at the rate of prior years' business.

39. In July 2018, there were vacancies in the Accounting Office that Ms. Washington would have been qualified to perform.  However, The Urban Institute did not transfer Washington, and did not consider transferring her prior to her termination.

40. In the 29 years Ms. Washington worked at The Urban Institute, she received no disciplinary actions.

41. She received annual performance evaluations, all of which were positive.

42. At the time of the requested accommodation, and at the time of the termination of her employment, Plaintiff was a qualified individual with a disability who was capable of performing the essential functions of her position as a Senior Contracts Administrator with reasonable accommodations.

43. Plaintiff had a record of disability at the time she requested accommodations for her disability.

44. Defendant also regarded Plaintiff as suffering from a disability.

45. The accommodations requested by Ms. Washington were reasonable. In fact, at the time The Urban Institute removed Washington's accommodations and insisted she must return to work full-time in person, Washington had been successfully performing her job on the part-time schedule with telework as had been accommodated in the past.

46. At the time of Ms. Washington's termination, other staffers for The Urban Institute were afforded accommodations to work remotely two or more days of the week and/or part-time although they lacked disabilities. Another staffer was also allowed to work full-time remotely although they lacked disabilities.

47. At the time of Ms. Washington's termination, another staffer for The Urban Institute who claimed a disability was afforded accommodations to work remotely and part-time; this staffer was white.

48. The Senior Contracts Manager who is white without a disability was granted telework or remote work options.

49. These other individuals who were afforded accommodations similar to those requested by Ms. Washington were not required to provide HR with quarterly updates from a physician to maintain their accommodations.

50. The Urban Institute did not engage in a good faith interactive dialogue to determine a) whether the requested accommodations could feasibly be continued, b) whether alternative positions were available, or c) whether any other accommodations might permit Ms. Washington to successfully continue in her Senior Contracts Administrator position and perform the essential functions of the position.

51. The Urban Institute has not shown and cannot prove that the requested accommodations would have amounted to an undue burden on The Urban Institute or posed any direct threat to Ms. Washington or others. To the contrary, it has conceded that the accommodations were not unduly burdensome.

52. By terminating her employment, The Urban Institute failed to reasonably accommodate Ms. Washington's disability.

53. The Urban Institute's decision to fire Ms. Washington was also motivated, at least in part, by animus and/or stereotypes regarding persons with disabilities, and/or their impact on the workplace, and constitutes intentional disability discrimination.

54. The Urban Institute subjected Ms. Washington to disparate treatment based on her race, by imposing more onerous restrictions on her workplace accommodations, and by offering more favorable accommodations to a similarly situated white coworker.

55. Defendant's unlawful actions have caused Plaintiff severe financial and emotional injuries, including the loss of salary and other benefits of employment (such as

retirement benefits, health insurance, dental and vision insurance, and life and supplemental life insurance), emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

56. Plaintiff enjoyed the work and her colleagues at The Urban Institute, and expected to remain as a productive member of The Urban Institute's team until the date of her natural retirement. The unexpected termination of her employment, after years of having been accommodated without difficulty and successfully fulfilling her role, caused Plaintiff tremendous emotional distress.

57. The Urban Institute's unlawful actions were willful, malicious, and/or taken in reckless disregard of Ms. Washington's rights under the law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

58. All prerequisites to bringing this action have been satisfied. Plaintiff timely filed a complaint of discrimination with the Equal Employment Opportunity Commission. Plaintiff has timely filed this lawsuit after receiving a notice of right to sue.

## COUNT ONE
## DISABILITY DISCRIMINATION (Failure to Accommodate)

59. All factual allegations of Paragraphs 1-58 are incorporated herein.

60. Defendant failed to accommodate Plaintiff's disability in violation of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, and the DCHRA, and instead unlawfully terminated her employment.

## COUNT TWO
## INTENTIONAL DISABILITY DISCRIMINATION

61. All factual allegations of Paragraphs 1-58 are incorporated herein.

62. Defendant intentionally discriminated against Plaintiff in violation of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008, and the DCHRA, by terminating her employment because of her disability.

## COUNT THREE
## INTENTIONAL RACE DISCRIMINATION IN EMPLOYMENT

63. All factual allegations of Paragraphs 1-58 are incorporated herein.

64. Defendant refused to accommodate plaintiff and instead fired her because of her race, in violation of the DCHRA, 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, as amended, 43 U.S.C. §2000e *et seq.*

## RELIEF

WHEREFORE, Plaintiff requests that this Court award her:

1) reinstatement in the position that she would have held in the absence of discrimination, retroactive to the date of the unlawful termination of her employment; if the Court determines (for whatever reason) not to reinstate Plaintiff, then Plaintiff seeks front pay in lieu of reinstatement to compensate Plaintiff for all future financial loss resulting from the discrimination;

2) back pay, retroactive to the date of her termination, and repayment of all salary, bonuses, awards, benefits, and other privileges of employment that she lost as a result of the discrimination;

3) compensatory damages in an amount to be proved at trial, including compensation for the pain, humiliation, emotional distress and loss of enjoyment of life that the discrimination has caused plaintiff;

4) punitive damages in an amount to be proved at trial;

5) reasonable attorneys' fees and expenses;

6) prejudgment interest on all monetary sums awarded;

7) such other relief as the Court deems just.

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.


   /s/
Richard A. Salzman (DC Bar No. 422497)
Sharon T. Rogart (DC Bar No. 1645202)
HELLER, HURON, CHERTKOF & SALZMAN
1730 M Street, NW; Suite 412
Washington, DC 20036
(202) 293-8090
Fax: (202) 293-7110
ras@hellerhuron.com
str@hellerhuron.com

Counsel for Plaintiff